**Ethel M. HERBERT, Appellant,**

v.

**SHARP BROTHERS CONTRACTING COM-PANY and Aetna Casualty and Sure-ty Company, Respondent.**

**No. 25524.**

Kansas City Court of Appeals, Missouri.

Feb. 1, 1971.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 5, 1971.

Application to Transfer Denied June 14, 1971.

Sherman L. Gibson, Hogsett, Shaffer & Gibson, Kansas City, for appellant.

James F. Stigall, Raytown, for respondent; R. Robert Cohn, Kansas City, of counsel.

JAMES W. BROADDUS, Special Commissioner.

This is a workmen's compensation case. The appellant, Ethel M. Herbert, made claim for death benefits as the unmarried widow of Earl LeRoy Herbert, an employee of Sharp Brothers Contracting Company, who died on May 25, 1967, as a result of an acute myocardial infarction.

The Referee denied compensation. This award was affirmed upon review by the Industrial Commission and also upon appeal by the Circuit Court. The claimant-widow has appealed to this court.

At the time this appeal was taken and perfected, the amount in controversy, exclusive of interest and costs, was less than $15,000, for the reason that claimant-widow is the sole dependent and the liability of any compensation installments due would terminate in the event of her death or remarriage. Since the death occurred on May 25, 1967, it cannot be said that the

amount in dispute exceeds $15,000, jurisdiction is therefore vested in this court. Snowbarger v. M.F.A. Co-operative, 317 S.W.2d 390, Mo.Sup.

Earl LeRoy Herbert, who was 53 years old at the time of his death, was employed as a foreman supervising cement finishers for respondent, a general contractor for a garage project at the Federal Reserve Bank Building located at 10th and McGee Streets in Kansas City, Missouri, he was six feet tall, weighed about 195 pounds, and was in apparent good health prior to the fatal attack. On the morning of his death he was first seen at 7:30 "at our little shack on the second floor of the building". He appeared normal and made no complaints of illness to his men or to the construction superintendent.

At 8:30 A.M., deceased employee went to the 5th floor, which was the top level of the building, and directed two cement finishers, Anthony Cassotta and O. E. McKern, to assist him in moving a large electric generator to the site where they would work.

According to the testimony of Cassotta: "He (Herbert) came up there to let us know he didn't want us to use the juice that was connected with the building. Q. Why? A. Because there were too many other companies using the juice and it would blow a fuse, so he said, 'Let's use the generator'." McKern was not called as a witness.

The generator, located approximately in the middle of the building, some 250 feet south of the area where the work was to be performed, weighed, according to Cassotta, "at least 1500 to 2000 pounds", and according to Donald Chapple, the job superintendent, "somewhere between 750 and 1000 pounds." It stood four four feet high, and consisted of a large motor mounted on a frame with two rubber-tired wheels, and an iron tongue, four inches wide, sticking out some three to three and one-half to four feet in front of the motor.

Deceased took a position on the left side of the tongue, witness Cassotta on the right side of the tongue, and McKern pushed from the rear of the vehicle. Cassotta testified that one could not "stand up straight and pull" the generator because "this tongue would be two or two and a half feet high, so you have to crouch over; you would have to bend over."

The vehicle was pulled the distance of some 250 feet over a concrete surface which, although approximately level, was strewn with debris (reinforcing steel and lumber) which the wheels hit on at least two occasions during the course of the movement. As described by Cassotta: "We hit something, whether it was a piece of steel or a two by four or what it was, I don't know, but it caused the tongue to turn. Q. To turn where? A. To his side, and we got going again and we got it out of the way of this debris and started out again. I don't know where it hit him, I didn't see. We were working—it done it at least a couple of times before we got it down to the other end of the building." In answer to questions on cross-examination he said: "It hit him, I know that. It hit him about a couple of times." On one occasion it caused him "to straighten up."

After moving the generator deceased, according to Cassotta, "was tired". He rested briefly, and then proceeded to crank the generator. "It was hard to start, I would say he tried three or four times. He tried to crank it and it would stop, he finally got it started."

Deceased left the scene immediately thereafter, went to a lower floor in the building and complained to the job superintendent of not feeling well, taking two aspirin. At 9 A.M. he asked to be taken to a doctor. He arrived at the doctor's office "at approximately 9:15 A.M." Later he was taken "by ambulance to the Downtown Hospital" where he died at 10:30 A.M. The cause of his death was shown as acute arrhythmia due to acute myocardial infarction.

Decedent had no known record of previous heart condition and the records of his attending physician covering the period from July 23, 1951 to January 11, 1966, reveal no complaint of any heart disease. His wife testified that he had made no complaints of heart trouble or ever received any treatment in connection therewith.

The only medical witness was offered by claimant-appellant. He was Dr. Michael Bernreiter, an eminently qualified cardiologist, who stated that the work was clearly a contributing factor to Herbert's death, and that the physical exertion described in the hypothetical question propounded to him could reasonably have precipitated the fatal heart attack. He further stated that the exertion described could reasonably have triggered or caused the myocardial infarction sustained by deceased. He also said that deceased's labors probably caused the rhythmic disturbance (acute arrhythmia and myocardial infarction) that led to his death.

As decedent supervised more than five men he was a foreman, and did not customarily work on the job. His job was to get the men started and tell them where to go. According to the Business Representative of the union of which deceased was a member, the "pulling of one of these things (generators) is not cement finisher's work. It was common laborer's work."

The facts in this case are not in dispute. Thus the Commission's conclusion is not binding on us. As said by our Supreme Court in the case of Corp. v. Joplin Cement Company, 337 S.W.2d 252: "Where the evidentiary facts are not disputed, the award that should be entered by the Industrial Commission becomes a question of law and the Commission's conclusions are not binding on the appellate court." (Citing cases.) The above language was quoted with approval in the later case of Merriman v. Ben Gutman Truck Service, Inc., 392 S.W.2d 292, 297, Mo.Sup.

In the case of Crow v. Missouri Implement Tractor Company, 307 S.W.2d 401, our Supreme Court held that where an employee's injury is a result of an unusual or abnormal strain arising out of and in the course of his employment, the injury is compensable, and an abnormal strain may be classified as an accident even though not received or accompanied by a slip or fall.

Although we are bound to follow the above rule laid down by our Supreme Court, we are mindful of the fact that it is said to be out of line with the majority of the decisions throughout the country. As stated in 1A Larson, Workmen's Compensation Law, Par. 38.30 at page 541:

"The preponderance of jurisdictions, that now accept the *usual-exertion rule in heart cases, is now almost two to one over those that reject it.*" (Emphasis ours.)

And at page 560 the author states: "At this point the present rule may be briefly summarized: A heart attack is compensable if attributable to unusual exertion under the older cases, *or* if attributable to an exertion placing upon the heart a strain greater than the wear and tear of ordinary life."

In support of the majority rule, Professor Larson cites a large number of cases. Among them are two very exhaustive and scholarly opinions. One by the Supreme Court of Arkansas, Bryant Stave & Heading Co. v. White, 227 Ark. 147, 296 S.W.2d 436, the other by the Supreme Court of Michigan, Sheppard v. Michigan National Bank, 348 Mich. 577, 83 N.W.2d 614. The opinion in the Michigan case was written by Justice Talbot Smith, formerly on the faculty of the Law Department of the University of Missouri at Columbia.

However, in view of the holding in the *Crow* case, supra, we decide the instant case under the unusual strain doctrine.

In the case of Brotherton v. International Shoe Company, 360 S.W.2d 108, the Springfield Court of Appeals refers to its former opinion in the case of Williams v. Anderson Air Activities, 319 S.W.2d 61, where: "We said that 'where an employee suffers an unexpected and abnormal strain (at least while he is engaged in doing something beyond and different from his normal routine) and, as a result, sustains an injury which is not the result of orderly natural causes, the injury is an accident within the meaning of Sec. 287.020(2).'"

In the case of Closser v. Fleming Company, 387 S.W.2d 194, 198, this court said: "From a study of the above authorities, we can arrive at two rather definite conclusions: (1) It is not necessary that claimant slip or fall; (2) If claimant suffers an injury resultant from an 'abnormal strain' and while he is engaged in doing something different from his normal working procedure, it is an accident under the Act and compensable."

Another case which bears directly upon the question which confronts us is by the Supreme Court of Pennsylvania, Hamilton v. Procon, Inc., 434 Pa. 90, 252 A.2d 601, 605 (1969). That court was reluctant to depart from the unusual strain rule, saying it was a matter for the Legislature. We quote from page 605 of that opinion:

> "For these reasons, we hold that the *unusual strain doctrine* is to be applied according to the work history of the individual involved and not according to the work pattern of his profession in general.

> "However, viewing the record in its entirety, we must come to the conclusion that the *overexertion, unusual to the deceased,* aggravated deceased's pre-existing heart disease to the extent that it did cause an 'accident' within the statutory meaning." (Emphasis ours.)

We have set out the evidence somewhat in detail. There is no need to again review it. It shows that deceased, a foreman—a supervisor, suffered an abnormal strain, to use the language of the *Brotherton* case, supra, "while he is engaged *in doing something beyond and different from his normal routine.*" And to use the expression of the Pennsylvania case, supra, the "overexertion" was *"unusual to the deceased"*.

Respondent relies heavily upon the case of Flippin v. First National Bank of Joplin, 372 S.W.2d 273, by the Springfield Court of Appeals. That case is clearly distinguishable from the instant case.

The judgment of the circuit court affirming the order of the Industrial Commission is hereby reversed with directions to the circuit court to set aside its judgment herein and to enter a new judgment reversing the order of the Industrial Commission and to remand the case to the Commission for further action not inconsistent with this opinion. Your Special Commissioner so recommends.

PER CURIAM:

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment of the Circuit Court is reversed, and the cause remanded with directions to the Circuit Court to set aside its judgment and to enter a new judgment reversing the order of the Industrial Commission and remand the case to the Commission for further action not inconsistent with this opinion.

All concur.